Are we ready to proceed? Mr. Hedges. Yes, Your Honor. Go ahead, sir. Good morning, Your Honors. May it please the court, I'd first of all like to request five minutes for rebuttal. OK. Section 327 categorically prohibits the retention of a professional with an actual conflict. The court said so in Congolium, in Marvel, Pilatex, and other cases. It's a per se party, Your Honor. How is there a conflict at all here? What is your conflict? So the most fundamental aspect of the conflict is the fact that Sidley represented Century at the same time concurrently was representing the Boy Scouts in an effort to exploit Century's policies. Century's policies were going to be, and indeed are, the foundation of the reorganization plan that Sidley developed for the Boy Scouts. What they were representing you with was what I call the hedge, the reinsurance aspects of it, right? Well, they were representing us in that and other matters. So we were an ongoing. Other unrelated matters before that, is that correct? That's correct. But under Rule 1.7, an actual conflict exists where a firm is representing a client, representing a party adverse to an existing client concurrently. That's a fact. Jambro, could I jump in just for a preliminary question here before we get into those fundamentals? And that is, as with so many bankruptcy appeals, we have had an appeal from the bankruptcy court to the district court, from the district court now to the court of appeals. The briefing frequently refers to actions by the bankruptcy judge and assertions of error by the bankruptcy court judge. In the first instance, the bankruptcy court judge made a determination here with respect to the issue of representation. And I am assuming that we are reviewing for abuse of discretion here in the ultimate decision made by the bankruptcy judge as upheld by the district court judge, is that right? Only at the highest level, Your Honor. That's the standard. But of course, abuse of discretion, is channeled by law and clearly erroneous facts, right? And we think there are multiple legal errors the court made in misunderstanding the 327 standard and failing to apply the 1.7 standard. Just wanted to make sure what our standard review is before we get into these very critical issues that you've referred to and that Judge Jambro foreshadows. Right. And so I think that the narrow answer, Your Honor, is de novo as to the issues that we're raising. What were the findings of fact that were made by the bankruptcy judge Silverstein? Well, there's a host of findings of fact among them, including the point that the work on the reinsurance was inescapably intertwined with the underlying BSA policies. What's the timeline? What is the timeline here as it applies to what you have referred to as they're being intertwined? Because we do know that Sidley is in and out in a relevant timeline here. Well, so I think there's two starting points, one of which is that Sidley, as a court, also another finding of fact was that Sidley was a longtime law firm for Century and was representing Century in a number of matters when it took on the BSA representation. What is the, and that is true, and that I think does figure into the findings of fact, but what is the import of that for the ultimate decision made by the bankruptcy court judge? So the import is that they were concurrently representing their long-term client, Century. At the same time, they took on a representation of the Boy Scouts directly adverse to Century's interest. They were the firm that on behalf of the Boy Scouts was effectively reaching into its own clients' pockets to take out ultimately $800 million to fund the Boy Scouts reorganization. It's difficult to imagine a more palpable, concrete- But, but, but, but with respect to that issue, who was representing Century? Who was representing Century? Yeah, was it Haynes and Boone? Oh yeah, I'm sorry, you mean Haynes and Boone was representing the Boy Scouts. The Boy Scouts, I'm sorry. That's correct. It's only partly correct, your honor. The Boy Scouts were the quote insurance council, but as to the fundamental conflict, it was Sidley's plan of reorganization that was going to tap and necessarily had to tap this incredibly important asset, which were the insurance policies that were maintained by Sidley's own client. The Haynes and Boone did not organize a plan that said, in effect, let's use Sidley's client's money rather than Boy Scouts' own money. That was the basic plan. Just in response to your answer, isn't it really tap into policies once removed because it wasn't the representation by Sidley of Century with respect to the initial Boy Scout insurance for reinsurance, that is a hedge against the insurance that Century otherwise would have to pay up if everything came to play. So that's what Sidley was doing for Century with respect to the Boy Scouts policies, but that with respect to your honor is irrelevant to the rule 1.7 actual conflict, which qualifies as an actual conflict under 327, because the point is Sidley was representing the Boy Scout, excuse me, Century in another matter, right? Nobody disagrees with that. And while it was representing Century, it was representing the Boy Scouts in an effort to tap Century's policies. That was what happened. The whole thing started at the meeting where Century showed up with its lawyers to discuss the plan of reorganization that the Boy Scouts were going to propose. Sidley was the one that ran the meeting to the surprise of Century. And at that meeting, what Sidley said was, the basic plan is going to be, we're going to use your assets to a certain degree and focus on those assets rather than the Boy Scouts' assets. Now, what you would expect in a normal world is for Century to respond, well, that seems like a problem to us. We think the plan of reorganization should emphasize, for example, the Boy Scouts' own assets more heavily. Let's call our lawyers. We want our lawyers to help us with that. Well, the problem is Sidley was their lawyer. Let's go back to Judge Smith's question about the timeline. As I understand it, roughly, it was around September 26th or so of 2018 that the Boy Scouts engaged Sidley to represent it. And then a few week or so later that the insurance group of Sidley was involved with representing Century in connection with reinsurance matters. Is that correct? That's right. The court said it substantially at the same time. I'm not sure the exact date, but it was a few days later. As I recall that things continued on and Haynes and Boone in connection with Boy Scouts matter was representing the Boy Scouts. And something happened many months later that all of a sudden you said, well, now we have a conflict because the filing wasn't until what? February 18th of 2020, is that correct? Right. So we got a long time in between and it was seen that only a month or two before that filing date of February of 2020 was there a severing of the relationship with respect to the reinsurance group representing Century on anything. What happened? So what happened is, and I'll go through the whole timeline if I can do it quickly. You're right about the rough time of the retention of Sidley by both Century and the Boy Scouts in the overlapping Boy Scouts matters. Remember though, Sidley was already representing Century in other matters. But that's happens in September. Sidley does not disclose any conflict to Century. So Century is unaware. To the exact contrary, Century saw a Wall Street Journal article shortly thereafter that merely said according to unnamed sources that Sidley was working on the Boy Scouts bankruptcy. Sent it to Sidley, effectively asking what's the story here. Sidley says, we cannot confirm or deny or explain anything about what's going on there but there's no conflict. So in the exercise of their fiduciary duty and nobody would assume they would ever lie, they told their client there was no conflict. So the client relied on that. And there's a variety of things, of course, a firm could do in a bankruptcy that wouldn't create adversity between Sidley and its client. And so there's nothing wrong with that assurance, at least in theory. We have no reason to doubt it. Let's talk about adversity and you quite correctly in response to my preliminary question, getting to the standard of review, indicated that of course, our review would be plenary when legal principles were applied. Fundamental to our inquiry here is the adversity or adverseness of interest, if such exists. And you rely in your brief on the Collier Treatise for the proposition that state law is represented by among other sources, the model code. And I think you referenced a little bit ago, 1.7 is relevant and important in determining what might constitute an adverse interest. Has that position been adopted by any courts of appeals? You've cited a treatise, but that's it as far as I can see. No, this court adopted it in Congolium. That was the dead square holding of Congolium was that the professional in that case was conflicted both because of a rule 1.7 violation and because of a section 327 actual conflict. But the professional in that case was actually representing both sides. Yeah, Congolium is a very different set of facts. Well, with respect, I don't think it's very different, but- It was suing, it was representing one client suing the other client. But that's the same thing here. The Sidley was representing Century and at the same time was effectively suing Century to reach into its pockets to fund the reorganization. That's exactly what Sidley was doing in this case, suing its own client. Even though it wasn't on the other side of a pleading of V, there's just absolutely no question that Century was adverse to Sidley and to Boy Scouts in this case. For purposes of the code of professional responsibility, isn't not being on one side of the other of the V fairly important? Well, I think that would be completely decisive, but it's functionally the same thing here. If you don't get an exemption because you haven't named the party as a defendant, under that theory, you could develop an entire case against the party and then not put your name on the pleading or something. I mean, that can't be the analysis. The question is whether you are adverse to your own client in the matter. And from the very beginning, and to get back to the timeline per Judge Ambrose's question, this truly came to light when we went to the meeting and that occurred, I believe it was in October, I may have that month wrong, of 2019 at Sidley's office. That's when we learned that Sidley would be the party developing a plan that was going to tap our assets, developing a plan, your honors, that overrides Century's rights under the Boy Scouts policies to defend and settle the case, developing a plan that would override various defenses by deeming the policies unimpaired. That's Sidley's plan. Was that meeting after the December, 2018 discussion between someone at Century and Mr. Snead? Yes, after Mr. Snead assured us that there was no conflict, we relied on his assurance and the cases proceeded without us having any understanding that Sidley was working on the Boy Scouts matter in a manner adverse to Century. That occurred later. The first time we got notice of that was later. You're arguing it's Bill 327 as though it sets forth a hard and fast unalterable rule, but didn't we say in BH and in Marvel that you have to allow the district courts to have a very, very flexible inquiry that will turn on a very specific fact inquiry depending on the facts of a given case? So not quite, your honor. I think in Marvel and in Congolium and Pillow Texts. Help me just with Marvel and BH. I really see Congolium being very different. I know you're arguing that it's basically the same because of the end result and the impact on the estate, but I really see them as being very different. And I don't mean to be setting Congolium for this point for the facts. I'm just saying it endorsed the same principle, which is an actual conflict is categorical, right? And all the cases, of course, reflect their own facts about whether something is an actual conflict. I'm not running from that, but it's been very consistent. And in Congolium and in Pillow Texts, despite the abuse of discretion standard, the court reversed, this court reversed or vacated the appointment of a professional under 327 because this court determined there was an actual conflict. And in both cases, the violation was 1.7. You have a motion to retain shortly after the bankruptcy to retain Sidley as the then counsel to the Boy Scouts. And Judge Silverstein found, looking at 327, it talks about, did Sidley hold any adverse interest to the estate? Because that's the actual textual language of 327. And she found that it did not, and that they were disinterested because the representation of Century was in the hands of Haynes and Boone. So that's what she finds. And there was no actual conflict and it goes up to the district court, district court affirms. And why do you, you're trying to now say, you've got to look at a professional responsibility rule 1.7 and 1.9 before you get to 327. And that's not the way any bankruptcy court that I know of looks at the issue. So there's a lot in the question, if I may. First of all, in Congolium, this court looked at rule 1.7 before 327. That's an analytical structure. Again, I don't want to dispute whether or not the facts are the same, but the analytical structure. But Congolium, very different facts. In Congolium, let's just say you start with 1.7 or 1.9. Okay. Basically, when you move to be retained in the bankruptcy world, you look at 327. That's it. And you can, it may be relevant at some point, as Congolium says, to look at 1.7, 1.9, but you start with 327. Okay. Accepting that, which I do think is not how this court described it in Congolium, but the court can say, you know- I read Judge Weiss' opinion pretty carefully. That's the way I'm reading it. Okay. But even then, starting with 327, Congolium clearly stands for the proposition that rule 1.7, a rule 1.7 violation, either establishes or at least informs the existence of an actual conflict. And let me get to the problem with Judge Silverstein's ruling on that. When she did the actual con- First of all, she said an actual conflict is not necessarily disqualifying. That's just wrong under this court's cases over and over again. If there is an actual conflict, it is disqualifying. So that's just a flat out error of law. And we could clarify that, but the point is that there was no actual conflict. Right. And the reason she said there was no actual conflict is she remember she did not do an analysis under rule 1.7. She did look at the case under rule 1.9 and said that there was not- It was a past representation. I'm sorry? She was basically under 1.9 saying it was a past representation. Right. And that's not correct. It was a 1. She didn't do a 1.7 analysis, which was that there's an existing conflict, which was Sidley's ongoing obligations to its existing client, Century. Sidley has had an obligation to treat Century's interest with an I single. Century was adverse to its other client. There's unambiguously a conflict that Sidley had in representing the Boy Scouts because Sidley owed concurrent obligations to Century. That's the conflict at the time of the retention. My final question is, are you still in arbitration? Yes. And what are you seeking in arbitration? So I don't know how much I can say. I think it's confidential, but we're certainly seeking the remedies you would expect from a breach of the contractual and ethical obligations that Sidley owed to us. But those are distinct from and wouldn't preclude the remedy here because of this court, again, emphasized in Congolium. Again, I'm not talking about the facts of Congolium, but just the principle of Congolium is that an insurer has standing to raise a conflict that a professional to be retained by the debtor has because among, first of all, it's about the integrity of the proceeding. And that can't be informed or controlled by a separate private arbitration, the integrity and public confidence in the outcome of the proceeding. And second, oftentimes, and Congolium, and this case for examples, the insurer is really the only party with an interest or stake who would raise a conflict like that. If we didn't raise this conflict, nobody would know about it. Congolium deals with that on the mootness issue, but in terms of what you're seeking, it seems like all you can really seek are disqualification. Sidley's no longer representing the Boy Scouts anyway, or disgorgement of fees. And if disgorgement of fees comes in, it goes to creditors and wouldn't go to you anyway. So what's your stake in the game now? So our stake in the game, among other things, but most importantly is the plan is not yet confirmed and will not be confirmed until all appeals are exhausted. So it's effectively like it's ongoing, right? And if Sidley's fees are disgorged, then that, and the plan is subject to renegotiation at any point, then it could very well affect our contribution, just put simple math. If $19 million comes into the estate, it could be offset against our $800 million contribution under the current plan. Again, if the plan, right now there is no confirmed plan. No, but the confirmation here is what? The 9th or the 14th of this month, right? Yeah, it starts, I think in a week, it's a three week hearing, but then after that, nothing is final until all the appeals are exhausted. So that's gonna go on for a long period of time. And if this court were to say, as we believe it should, consistent with its prior precedents, that Sidley breached its ethical obligations because it took on the Boy Scouts while it was already representing at a critical adverse party- But the settlement agreement, as I understand it, specifically excluded this particular claim. Is that correct? That's correct. Well, it excluded the dispute between Sidley and Century. So that's off the table. So I'm not quite sure how that affects confirmation. Well, what I'm saying is the confirmation, it's not yet confirmed. It's not yet confirmed by the district court or by the bankruptcy court and all of the appeals haven't been exhausted. So absent confirmation, there is no settlement. There's no agreement until it's all over. And at any point, if the court below, and this court affirms an order of disgorgement, up to $19 million could come back into the estate during this proceeding. And it could be used, for example, to defray the costs of other professionals who are continuing to work on it. Right now, as we've noted in our supplemental brief, money that would otherwise go to claimants is being taken away from them to pay off professionals in order to facilitate the bankruptcy. Approximately how many claimants are there at this point? Do we know? We lost Mr. I think we had just lost him. Yeah. It'll be a good segue to go to the next matter anyway, once he gets back on. Yeah, he had five minutes on rebuttal. As long as he can hear us, we're gonna make sure he can hear us and we can just go. No, I think he completely left. Give me one second to see if I can get a hold of him. No problem. He discouraged himself. I'm not gonna touch that. Good, I shouldn't have. How many pictures do you have on your desk, Brooks? I don't honestly know, only a few. There's not a Winston there. Where's Winston? No, Winston hasn't graduated. Katie's there, Karen is there, my parents are there. I think my sister may even appear somewhere. Gotta get you one of Winston. Hi. Mr. Acker, we know we lost you. We did not, we cut off our conversation except for- My sincerest apologies, Your Honors. No problem. No problem. Let me just quickly ask this, and I know you have some time to rebuttal. My understanding is that the abuse of discretion is satisfied here, you're arguing, because the district court made an error of law and not looking at the factual record here and concluding an actual conflict under 327, i.e. should not have been appointed an error of law, constitutes abuse of discretion. And so all the other subtleties you're saying we don't need to get into in terms of moral role and BH and 1.9, 1.7, they all kind of go away because there's an abuse of discretion. That's basically what you're arguing. Well, I mean, I think it's a part of what we're arguing. If I can just really simplify it, I think there's two errors of law, both of which subject to de novo review, at least two errors of law. One is saying that an actual conflict is not automatically disqualifying under 327. That's contrary to this court's cases time and again. Yeah, that I get. My concern is the finding of the actual conflict because that seems to line everything up. Right, no, I understand that. And the problem there is she only analyzed an actual conflict under rule 1.9, misunderstanding. She's treating this as a moral representation issue when in fact, both under the present tense, we accept that 327 is written in the present tense, but there was a present conflict because Sidley owed undivided loyalty to Century. At the same time, it owed undivided loyalty to BSA, and you cannot square that circle in this bankruptcy given the importance of Century's policies to Boy Scouts and organizations. Okay, thank you, Mr. Hacker. Thank you. Thank you, your honors. May it please the court, Rob Hockman for Sidley. May I ask you just a question at the outset when we sent an administrative request out last week, let us know there were two cases that initially came before us, 21-792 and then 21-2035, which is today's case. And 792, we were asked a month or two, a couple of months ago, could you postpone that for March because we're awaiting confirmation? And nobody said anything about 21-2035. So we just asked, okay, we assume that's not postponed, but just confirm that to us. And then out of the blue, you're now saying, well, it's moot, but you never suggested moot in your brief at any point in time. And I'm lost as to why at the very last moment in response to a factual question that we get a legal argument that somehow this case is now moot. Yeah, your honor, let me explain that. So at the time that we briefed the case, there wasn't a settlement yet with Century. We didn't have a date yet for confirmation. And we understood your question that the proximity between the potential confirmation of this plan and this hearing raised the question about whether it just as a matter of prudence, the court and the use of the court's time, whether it would make sense for the court to wait to see what falls out of the confirmation hearing. Because I think if the plan is confirmed and that confirmation obviously remains, there really is no financial interest remaining for Century. And there's just no way to square their standing under the combustion engineering standard, which refers to a pecuniary interest. I mean, you heard about their interest. In their brief, in their submission, they said, well, there's a pecuniary interest because we care about the settlement. But really what they're saying is they just wanna have their settlement. And that's fine. But I think that that means that would moot the case. I don't think it's moot as we sit here today. That's not our position. But we understood you to be asking just sort of as a prudential matter, how should we proceed under the circumstances? It was essentially a factual question. But the point about, this is where Congolian comes in. Even if it was supposedly moot among the parties, these are the kinds of issues that affect bankruptcy generally. And it's good that a relaxed standard apply with in order to allow courts to give guidance to the bankruptcy court. And that's what Congolian says that makes a lot of sense. And I was just surprised to see all of a sudden the claim that this matter is moot. Yeah, I'll just say, Your Honor, about that. I think that's true as a general matter. And with respect to the U.S. trustee, when the U.S. trustee is the party bringing the appeal, protecting the interest of the estate, I think that's a more defensible position. But as Combustion Engineering makes clear, there's also an Article III question when you're talking about private parties. Congolian came after Combustion Engineering. I was on the panel in Combustion Engineering and Congolian is talking about, yes, it may look as if there isn't any further conflict or whatever it might be. But for the sake of the system, we are going to apply a relaxed rule and we're going to weigh in because it's important. And I understand that and I respect that. And obviously, that's a matter of this court's practical judgment, which we obviously will respect. I only think it's important for us as officers of the court to alert the court to any potential looming Article III issues, which are not necessarily subject to the same kind of relaxation. That's a judgment for this court to make, even in bankruptcy. I think there's an argument to be made that Article III applies and that's just the issue. But I don't want to dwell on that because as this court's questions make clear, on the bankruptcy court did exactly what it was supposed to do. And I think, and I do think- Is there any, one of the factual question was referenced to 19 million paid to Sidley. Is Sidley received everything by way of its fiapps that's entitled to, or was there the typical holdback in bankruptcy? There's a holdback. There is a holdback. Okay, there still is a holdback. Okay, I got it. So you still have skin in the game. Yes, sort of, Your Honor. I'm through. So, but let's turn to 327A because that's where the questions were really focused. That's where the bankruptcy court started and it's the right place to start. And what the bankruptcy court did is it looked at 327A and it looked at this court's cases. And I think what happened, Judge Ambrose, I think you even mentioned that there may be something that this court can clean up in this case. And I think that's exactly right. And it's really just a sort of confluence of language, a little bit of wordplay, you might even call it. This court has said that when there's an actual conflict, disqualification is required. But that phrase interprets the phrase as you mentioned, Judge Ambrose, interest adverse to the estate in 327A. That's the language that's being applied. Actual conflict does not mean any conflict as defined by 1.7 and 1.9. And in fact, courts across the country have recognized that an actual conflict or an automatically disqualifying interest adverse to the estate is an economic interest that would lessen estate values. The Second Circuit, the Third Circuit, the Fifth Circuit, the Seventh Circuit, the Ninth Circuit, we've cited all of them in the brief, they all adopt that standard. Everyone has taken the same view of this. And that's the question, the kind of conflict that Century is alleging here, is that the kind of conflict where Sidley is alleged to have an economic interest that would lessen estate values. And the bankruptcy court said, no, there's no question about that. It's obvious that Sidley can act in the best interest of BSA. That's what 327 is about. And Century isn't even complaining about Sidley's ability to fully represent the debtor or creditor interest. And as this court questions indicate, Congolium just reflects that approach. It's of course the case that there are going to be situations where a violation of 1.7 is also a violation that amounts to an economic interest that would lessen estate values, but it's the latter standard that governs. And all of this shows why a rule of automatic disqualification for ethical violations is particularly inappropriate under 327A. Courts have consistently recognized that 327A protects debtor and creditor interests. It does not protect those like Century who hold assets of the estate that can be used to satisfy creditors. That's what the arbitration is about. What I understand you'd be saying is, I think there was some language by Judge Silverstein where she said that even assuming an actual conflict, the per se disqualification rule of 327 doesn't kick in. And the point is, if there's an actual conflict based on Marble, you really would be disqualified, right? Exactly. And I think what the bankruptcy court was saying there, if there's an actual conflict under the ethical rules, it's not the kind of conflict that triggers the Marble standard for automatic disqualification. And by the way, Judge McKee, it is absolutely the case that this court has said in BH and P and Pillow Text, that this kind of question is the kind of actual conflict that would be automatically disqualifying. That requires deep factual engagement with the case. And that's why the bankruptcy court does have considerable discretion in determining whether such an actual conflict exists. The bankruptcy court here found that that's not the kind of actual conflict that exists here. And that's just right. Analytically, what should be the role, if any, of 1.9 and 1.7 here? I actually, I think the first, I think the question that you should begin with, Your Honor, is that putting aside whether there is a violation of 1.9 or 1.7, is the interest at issue, the supposedly conflicting interest at issue, one that satisfies the 327A standard? Then- That's kind of putting it the other way. It does go to my question, but does 327 do all the heavy lifting here, or is there a need for us to resort to 1.7 or 1.9? So there is not, in this case, there's not a need to resort to 1.7 or 1.9. And let me explain why. It's not because they never matter in bankruptcy. That's not the point, right? And there might be circumstances, but what Century needs is automatic disqualification because it has no basis, absolutely none. And I'm gonna get to that in a minute to suggest that the balance of prejudice to Century and BSA could possibly favor disqualification here. You could get to 1.7 and 1.9 after you've decided there isn't a basis for automatic disqualification. You could turn to 1.7 and 1.9, look at the nature of the supposed conflict and decide, okay, well, now I need to answer whether there really is a conflict to exercise my discretion, whether the very severe sanction of depriving the debtor of its chosen counsel is warranted. But when you look at that, and that's what the bankruptcy court did here, by the way, it said, I've decided automatic disqualification doesn't apply and I'm gonna turn to asking the questions, okay, what is the kind of violation at issue here? Could that possibly warrant preventing BSA from retaining Sidley, its counsel of choice? And based on the record, it determined that it could not possibly for two foundational reasons. First, Century's core concern was basis. It was concern. Its confidential information would be used against it, but the bankruptcy court specifically found that had not and would not happen. Found it more than once. You can see it at JA 40 and 42. That finding is not only entitled to deference, it's absolutely right. From the start of the BSA engagement, as the court has already acknowledged, Sidley was excluded from coverage issues. Haynes and Boone handled everything about that. Second, the bankruptcy court noted that it was also undisputed that BSA would suffer great prejudice had Sidley been disqualified. That's also at JA 42. And that finding is both entitled to deference and also clearly correct. The cost to BSA- Is that disputed? Is the prejudice disputed? I don't think even, the cost to BSA has even been disputed. I don't think it's possible to dispute. The cost to BSA in time and resources of replacing the counsel that had worked for 18 months to prepare a prepackaged bankruptcy, especially in light of the challenges the pandemic posed at the time, were substantial. And that's, so the bankruptcy court just did it right. It doesn't have to get into 1.7 and 1.9. When was Haynes and Boone brought in to represent Century in connection with the reinsurance issues? You represent BSA with respect to- BSA, BSA. Yeah. So Haynes and Boone had actually been retained as coverage counsel for BSA before Sidley was. That predate, their relationship predates ours. It would appear that then the logical next step would have been an ethics screen put into place, but that was not put into place immediately. It was done later. Why the delay here? I think that that just was, that just was the way it fell out because we really weren't getting that information. And we're not, our engagement letter carved out that we were not engaged to undertake that, any of that work. And we didn't. And obviously it's also the case, I think, and the court is certainly more familiar with this than I might be, that it's very common for debtors. And I think that there's just a bad mischaracterization by Century, that debtors are represented by counsel in complex court-based insurance bankruptcies that have relationships. There's not an automatic adversity there, even if the insurance policy is a significant asset of the estate. That's just an asset like any other. And at the end of the day, with proper carving out of responsibilities, I mean, this is one of the real issues. I think that Century is, to reverse Century asks, would we run to the real issues that would be thrown into chaos? Because the use of coverage counsel like this is critical for the smooth function. Yeah, I mean, I think part of the problem, just looking at it practically, in 2019, while Haynes and Boone was in the room representing the Boy Scouts with respect to Century, the facts show that there were people in the reinsurance group at Sidley also in the room. For what reason, I don't know. I don't know to what extent they were advising. And to some extent, that's what really, one probably should say an ethics screen would have been helpful to have avoided the black and white areas becoming gray. So just to be clear, I don't think Mr. Snead ever had any, none of the reinsurance work, people working on the reinsurance matter at Sidley were ever in the room for discussions of the bankruptcy matter. What happened is Century got claimed to get concerned that Sidley was representing BSA when they went, that it happened at Sidley's offices, that the bankruptcy lawyers for Sidley were representing BSA. But there was never the overlap between the reinsurance work that was being done and the bankruptcy work. So I just wanna clear that up. I just have two quick factual questions. Are you doing any work currently on the BSA bankruptcy? No. Okay. And how does this proceeding interact with the ongoing arbitration? The same question I asked your opposing counsel. Yeah, and the answer is, this proceeding doesn't interact with the ongoing arbitration in the sense that if the court sticks to the 327A standard, the Century is gonna have its day under the 1.7 and 1.9 standard, which is the basis of its breach of contract claim against Sidley, they're gonna have their hearing. And so their interests are actually protected in exactly the way they agreed to have it protected, which is in an arbitration with Sidley. What they're trying to do is leverage that to deny BSA its chosen counsel at a critical moment and try and remember, as this court is surely aware, courts have observed how disqualification motions can be used strategically by those with an interest in delaying the resolution of complex bankruptcies. So the new law that Century is asking you to make would vastly increase the chances such strategic gambits will succeed contrary to the goals of the bankruptcy code. That's a big deal. So I think the law is sound. It was soundly applied here. BSA would have suffered greatly. Century has not suffered at all. Century will have its meritless claim against Sidley adjudicated in the arbitration it agreed to. And this court should affirm for those reasons. If you have no further questions, you'll remain to my time. No, I have no further questions. Okay, thank you. Mr. Hockman, Mr. Hacker. Thank you, your honors. Just a few points. First of all, Judge McKee, I mentioned there was two legal errors. I wanna add a third that's partly answers some of Mr. Hockman's arguments, which was a ruling that there was no actual conflict because the bankruptcy court found that Sidley could represent the Boy Scouts vigorously despite its duty of undivided loyalty to Century. First of all, the court didn't analyze or even account for its duty of undivided loyalty to Century, its other client. And that's the problem. It's not relevant. You don't make a subjective inquiry into a motive that a party could represent the debtor vigorously. Congolium, again, rejects that. In Congolium, the debtor wanted that counsel. The debtor waived the conflict. And this court said, because of the stain on the proceedings, that it was not enough to allow the debtor to pursue it that way. Second, Mr. Hockman says that actual conflict is just a sort of shorthand for adversity to the estate and that the correct analysis, the correct standard is whether there's an economic interest that could lessen the estate value. What does 327A say, your honor? It's whether or not the professional holds or represents an interest that is adverse to the estate. Did Sidley, at the time of its retention, represent an economic interest that could lessen the estate value? I cannot think of an interest more concrete that could lessen the estate's value than Sidley's duty of undivided loyalty to Century and the policies that Sidley knew and planned to be the foundation of the bankruptcy. Sidley represented that interest by Mr. Hockman's own standard. There was an unambiguous actual conflict under 327A. It's not just creditors, remember. 327C addresses the adversity with respect to creditors. 327A is about other entities, including those in the position of Century. The court and Mr. Hockman emphasized that Sidley was excluded from, quote, coverage issues by the retention of Haynes and Boones. I wanna be very clear about this because I think it's absolutely critical. The dispute here, the issue here is not about coverage issues. That Sidley was not representing, we are not saying that Sidley was representing the Boy Scouts with respect to a given policy exclusion or the definition of occurrence under the policies. Those are coverage issues. What Sidley was representing the Boy Scouts in is how much to rely on Century's policies versus other sources of funding, like the Boy Scouts' own assets. The negotiations throughout, Your Honors, the whole point, literally the fulcrum of the negotiations was how much of the workout, the reorganization was gonna be funded by Century and other insurers versus Boy Scouts' own assets, real estate and art and other things. And Sidley was arguing- You're saying your carve out this is totally irrelevant. It's red herring. The carve out provision in the retainment you're saying is a total- It's a complete red herring. It's only about coverage issues. We get that. That's fine. This problem, Sidley's duty of undivided loyalty to Century was violated, not because it made an argument about the application of an exclusion under Century's policies. It was violated because Sidley was demanding on behalf of the Boy Scouts that Century be the principal, be a main source of funding rather than more money coming from the Boy Scouts. Century was trying to argue that the Boy Scouts should submit more of its assets to fund its reorganization. It was an argument against its own lawyer in the case. I mean, it's a classic actual conflict under about 327A, again, under Mr. Hawkman's own standard and a violation of rule 1.7. And for that reason, it is clearly that there, the point is not that there's automatic adversity in every case, as Mr. Hawkman suggests. It's not automatic adversity. It's adversity in this case because of the importance of Century's policies to the plan that Sidley was going to propose. At the end of the day, your honors, Sidley does not accept the proposition, or Sidley advances the proposition, I should say, that it is okay for a firm to drop a client to whom it owes an undivided duty of loyalty like a hot potato in order to take on the more lucrative representation, which is exactly what happened here. This court, we should submit, should not endorse that kind of conduct in a bankruptcy because as this court has repeatedly emphasized, duties, if anything, in a bankruptcy are heightened. I don't see how the hot potato doctrine applies here. Hot potato, I mean, I saw it happen in the 80s in big merger M&A cases where you were representing a client and you would just drop that client because you had a much bigger representation coming up and completely just drop the client. Here, there were all kinds of activities done in order to try to reassure Century that it was being represented well, and indeed it was, I assume by Haynes and Boone. And this case is so different than Congolium. Congolium is the firm was representing the debtor versus asbestos claimants and then was co-counsel to the asbestos claimants. So factually different than here. I accept, I mean, all cases are different. I'm not saying that the facts are the same as Congolium. What I'm saying for Congolium is that it establishes the proposition that when there is an actual conflict, non-retention is categorical and the actual conflict is established here, not because it's the same facts as Congolium, but because Sidley owed a duty of undivided loyalty to the Boy Scouts on the one hand and to Century on the other. Nobody disputes that. Sidley doesn't say they didn't owe it. But with respect to the issue of reinsurance, the undivided loyalty was owed by Haynes and Boone. Only with respect to coverage issues, Your Honor, an argument about what the construing the policies. What Sidley was saying is, in its exercise of its duty of loyalty to the Boy Scouts, is the Boy Scouts would be best off if its insurer, Century, was the primary funder and submitted hundreds of millions of dollars to fund the reorganization rather than Boy Scouts' own assets. But as Sidley was saying that, it had a duty of undivided loyalty to Century and it unambiguously contravened that duty. If I can just say one word about why the hot potato doctrine applies here is in response to Sidley's proposition that it could withdraw permissibly because there was a conflict. In Sidley's own account, if you look at JA 1329, the reason Sidley withdrew was that no headboard would be made after the January 3rd letter as Century continued to assert that it could not rule out a conflict or potential conflict and would not agree to any waiver. So the reason Sidley withdrew is it wasn't getting a waiver from Century. But that would drain the hot potato doctrine of any point whatsoever because in all cases, in all situations, the whole point is you can't get a waiver from the client and so you have to choose between which client you're gonna continue to maintain your undivided loyalty to. And Sidley had an obligation to continue its duty to us. The hot potato doctrine applies, Your Honor, because it says Sidley couldn't choose to take on the more lucrative one rather than continue to maintain its duty to its longstanding client, Century. No further questions. Thank you for your time. Thank you. Fine argument from both of you gentlemen. It's greatly appreciated. We'll take the matter under advisement unless either you, Judge Amber or Judge Smith want a transcript, we'll just move to the next case. I don't see a need for a transcript. I wasn't going to ask for it. I don't either. Okay, fine. Thank you both very much. Thank you, Your Honor.